Vano I. Haroutunian (VH 1010)
Ballon Stoll Bader & Nadler, P.C.
1450 Broadway
New York, New York 10018
212-575-7900
*Attorneys for Plaintiff*

**07 CV    6108**

*JUDGE CASTEL*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

FASHION WORLD, LTD.,

                                    Plaintiff,

            - against -

JEFF GREEN, ZIARI INTERNATIONAL, LTD.,
US MERCHANTS FINANCIAL GROUP, INC.,
THE MERCHANT OF TENNIS, INC., LISA
NUNZIATA and METAMORPHOSIS, INC.,

                                    Defendants.
-------------------------------------------------------x

07-CV-._____

JUN 2 8 2007
U.S. ___ SDNY.
COMPLAINT CASHIERS

*Preliminary Injunction Requested*

Plaintiff, by its attorneys Ballon Stoll Bader & Nadler, P.C., states, upon information and belief:

### JURISDICTION AND VENUE

1.      In chief, this is an action for relief under the Trademark Act of 1946, **15 U.S.C. §§ 1051**, *et seq.*, as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 ("the Lanham Act'), including for (but not limited to) counterfeiting, infringement and dilution of a trademark owned by plaintiff.  In addition, plaintiff seeks relief for defendants' related misconduct including breaches of contract and of the covenant of good faith and fair dealing, interference with business advantage, unjust enrichment, unfair competition and deceptive business acts and practices under the laws of the State of New York.

2.     The Court has original jurisdiction pursuant to **15 U.S.C. §§ 1116** and **1121** and under **28 U.S.C. §§ 1331, 1332** and **1338 (a)** and **(b)**.  Pursuant to **28 U.S.C. § 1367** this Court has supplemental jurisdiction over plaintiff's claims for trademark infringement, trade name infringement, unfair competition, and dilution and under the laws of the State of New York.

3..     Venue is proper in this District pursuant to **28 U.S.C. §§ 1391** and **1400** in that a substantial part of the events involved in the claims occurred in this district.

## THE PARTIES

4.     Plaintiff Fashion World, Ltd. and its affiliates ("plaintiff" or "Fashion World") is a corporation, organized and existing under the laws of the British Virgin Islands, and is duly authorized to do business in the State of New York.

5.     At all times relevant to this action, Fashion World was and still is the owner and Licensor, for any and all purposes (including the design, manufacture, advertising, promotion, marketing, sale and distribution of fashion products) of the trademark, "**F by Fortuna Valentino**" ("the Mark"), which is duly registered in the Principal Register of the United States Patent and Trademark Office ("USPTO").

6.     The Mark is a valuable and exclusive high fashion symbol which derives its high standing in the fashion markets in part from its association with the generations-old "Valentino" family fashion dynasty and in part from the high quality of the products with which plaintiff permits the Mark to be associated.  At all times relevant to this action plaintiff has acted, and continues to act, to protect the standing, quality and integrity of the Mark in order to preserve and further enhance its value.

7.    Defendant Jeff Green ("Green") is a principal and the Chief Executive Officer ("CEO") of US Merchants Financial Group, Inc. ("USM"), The Merchants of Tennis, Inc. ("MOT") and Ziari International, Ltd. ("Ziari"), each of which is a California entity having its principal place of business in or around Los Angeles, California.

8.    Defendant Green engaged in the wrongful acts described herein for his personal benefit and enrichment, utilizing his complete dominion and control over USM's, MOT's and Ziari's business transactions and activities, which he operated as his agents and as the agents of each other.

9.    Defendant Lisa Nunziata, also known as Lisa A. Nunziata, Lisa A. Gherardi, Lisa Nunziata Gherardi and Lisa Nunziata Gherard (" Nunziata"), is a natural person who resides and transacts business in the State of New York, including in the name of Metamorphosis, Inc., a New York corporation ("Metamorphosis").

10.    Defendant Nunziata engaged in the wrongful acts described herein for her personal benefit and enrichment, utilizing her complete dominion and control over the business transactions and activities of Metamorphosis, which she operated as her agent and instrumentality.

## PLAINTIFF'S LIMITED LICENSE TO ZIARI

11.    Plaintiff's business includes the granting of limited, individual licenses to various persons and business entities, to design, manufacture, advertise, promote, market, sell and distribute one or more specific types of fashion products bearing the Mark.

12.    On or about January 26, 2005, plaintiff, as the owner and licensor

of the Mark, and defendant Ziari, as licensee, entered into and executed a written License Agreement ("the License Agreement"), a true and complete copy of which is annexed as **Exhibit A**.

13.    In the written License Agreement in **Exhibit A**, plaintiff conveyed to Ziari a limited license (hereinafter: "the written License"), for the calendar years 2005 through 2008, to use the Mark, subject to all of the written provisions in **Exhibit A**, in Ziari's design, manufacture, advertising, promotion, marketing, sale and distribution of certain specified types of "Licensed Products" as defined in section 1.1 of **Exhibit A**

14.    The written License further limited Ziari, *inter alia*, to using the Mark only in connection with sales of Licensed Products to the superstores Costco, Sams and Bjs for resale by Costco, Sams and Bjs (in Ziari's reasonable belief) within The United States (as defined therein), Canada and Mexico.

## PLAINTIFF'S ROYALTY RIGHTS

15.    In section 4.1 of the written License Agreement in **Exhibit A**, defendant Ziari agreed to pay plaintiff, on a quarterly basis, commencing April 15, 2005 and thereafter, on or before each of the dates of January 15, April 15, July 15 and October 15 in the years 2005 through 2008, royalties equal to five percent of Ziari's net sales of the Licensed Products as provided in section 1.1 of **Exhibit A**.

16.    Under section 5.1 of the written License Agreement in **Exhibit A**, plaintiff is entitled, *inter alia*, to full access to Ziari's books and records relating to the computation of royalties due plaintiff.

## DEFENDANTS' ILLEGAL CONDUCT

17.    Defendants Green, USM, MOT and Ziari, collectively or individually, have knowingly and willfully:

(1)    distributed, sold and offered Licensed Products bearing the Mark for sale in interstate commerce, and have intentionally and deliberately concealed sales from the Licensor to avoid paying the royalties due to plaintiff under the License Agreement in **Exhibit A**;

(2)    have misappropriated and converted the royalty amounts received by them upon for sales they have made in interstate commerce of Licensed Products bearing the Mark, due to plaintiff pursuant to the License Agreement, and

(3)    have distributed, sold and offered products bearing the Mark for sale in interstate commerce, with which they are not authorized to so treat.

18.    Defendants Green, USM, MOT and Ziari, collectively or individually, have offered for sale or sold the Licensed Products, have deliberately misled plaintiff and have concealed the amount of their sales of products bearing the Mark during each of the calendar quarters for the periods 2006.

19.    For example, during the first quarter of 2006, plaintiff received from defendants Green, USM, MOT and Ziari, only one-half of the royalties due from the sale of the Licensed Products, receiving 2.5% of reported net sales instead of the 5% royalty under the terms of the Agreement. Annexed as **Exhibit B** is a copy of defendant Ziari's sales report showing that, in its February 23, 2006 sale of a "Fortuna Valentino Lounge Set" to Costco Canada New Club, Ziari paid plaintiff a royalty of only 2.5%, in clear breach of the License Agreement.

20.    Likewise, defendant MOT deliberately and knowingly paid Plaintiff a 2.5% royalty in connection with its 2006 third quarter sale of Licensed Products to Sam's Club and Costco instead of the 5% royalty under the Agreement. *See* **Exhibit C**.

21.    Defendant USM also deliberately and knowingly paid plaintiff less than its proper 5% royalties in connection with USM's 2006 fourth quarter sale of various Licensed Products.    Calculated at 5% of USM's gross sales under the Agreement, Plaintiff's royalty is $17,234.   However, Plaintiff was paid only $15,451. See **Exhibit D**.

22.    Additionally, during the first quarter of 2007, defendant MOT again knowingly and deliberately paid Plaintiff less than a 5% royalty rate in connection with MOT's sale of the Licensed Products.  In the attached Commission Statement (annexed as **Exhibit E**), MOT stated a 0.025% royalty rate being due to plaintiff and paid royalties of a mere $9,877.89 based on admitted total sales of $440,100.00; *see,* the check annexed as **Exhibit F**.[1]

23.    In addition to breaching their obligation to pay plaintiff its full royalties due under the License Agreement, defendants Green, USM, MOT and Ziari have also failed to include all of their sales in their required sales reports. For example, attached as **Exhibit G** is a receipt from Sam's Club of a purchase by one of plaintiff's principals of a Licensed Product sold to Sam's Club by the defendants.  Plaintiff's close inspection of defendants' sales report for the third quarter 2006 reveals that this particular sale was not reported.   In short, defendants knowingly and deliberately concealed sales in order to misappropriate and convert royalties due to plaintiff.

---

[1] Even assuming that MOT's total sales for this period was only $440,100.00, defendants nevertheless paid plaintiff less than the royalties due under the License Agreement.  On total sales of $440,100.00, plaintiff is entitled to $22,005.00 in royalties.

24.     Plaintiff discovered further such fraudulent activity by defendants Green, USM, LOT and Ziari when it discovered USM's concealment of sales of the plaintiff's Spring/Summer 2007 collection.  Indeed, one of USM's former sales brokers, who has since left USM, accounted to plaintiff for shipments of Licensed Products worth **$2,553,267.46** for that Season.   To date, plaintiff has not received royalties of $127,663.73 due on those sales.

25.     Further, defendants Green, USM, LOT and Ziari distributed and/or offered for sale and/or sold Licensed Products to customers other than the superstores Costco, Sams and BJs, which were their only authorized customers for Licensed Products. Attached as **Exhibit H** are copies of offers of sale of the Licensed Products posted on E-Bay, an online auction and shopping website not listed as an authorized channel of distribution under the License Agreement.

27.     Defendants' unauthorized "sublicense" to E-Bay, and their sales to entities other than the authorized channels of distribution is causing and is likely to further cause confusion, mistakes and misinformation to and deception of the general purchasing public about the origin of the Licensed Products, Defendants Green's, USM's, MOT's and Ziari's misconduct is likely to deceive the public into believing that the Licensed Products being sold by third parties originate from, are associated with or are otherwise duly authorized and licensed by plaintiff, all to the damage and detriment of the Mark's reputation and goodwill.

28.     Aside from deliberately and knowingly failing to pay plaintiff its full royalties, defendant USM has also egregiously concealed its unauthorized sales of handbags bearing the Mark ("handbag sales").  USM stated to Plaintiff that it had sold a

a mere 3,000 handbags from the Spring/Summer 2007 collection, but purchase orders from TJMaxx and Marshalls, completely unauthorized customers, show that they were able to buy more than 25,000 units. *See* **Exhibit I**. Defendants Green and USM deliberately concealed those sales from plaintiff.

29.     In addition, and contrary to defendant USM's statements that it had made no handbag sales for the period ending March 31, 2007, purchase orders (annexed as **Exhibit J**) from QVC, Inc., another wholly unauthorized customer of defendants Green, USM, MOT and Ziari, show handbag sales totaling $104,100.00. No royalties were paid on those sales.

30.     USM further distributed, marketed, offered to sell and sold handbags bearing the Mark ("Infringing Products") totaling $695,000.00 to various unauthorized distribution channels, and concealed their obligation to pay the $34,750 in royalties which would have been due on those sales.

31.     Defendants Nunziata and Metamorphosis, apparently having previously worked with defendants Green, USM, MOT and Ziari, have also infringed upon, misappropriated and counterfeited the Mark. Nunziata, seeking to avoid sharing revenues with defendants Green, USM, MOT and Ziari, proposed to plaintiff that it grant her an additional license to her, to market handbag bearing the Mark to customers other that Costco, Sam's and Bjs.

32.     Plaintiff, having a right to issue such additional licenses, offered Nunziata an opportunity to demonstrate her marketing ability, but has never entered into a Licensing Agreement with Nunziata or Metamorphosis. Nunziata grossly exceeded

her authorization from plaintiff, by attempting to handle many more units than the test sampling which plaintiff had authorized.

33.     Defendants communicate and cooperate with each other in their business and fraudulent operations in interstate and intrastate commerce, including commerce in the State of New York and in this judicial District, in violation of plaintiff's rights.

## COUNT ONE

### FEDERAL TRADEMARK COUNTERFEITING AND INFRINGEMENT (15 U.S.C. § 1114)

34.     Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

35.     Plaintiff's Mark and the goodwill of the businesses associated with them in the United States are of great and incalculable value, are highly distinctive and appealing, and have become universally associated in the public mind with products of high quality, value and reputation.

36.     Without plaintiff's authorization or consent, and having knowledge of plaintiff's well-known and prior rights in the Mark, and knowing that defendants' Infringing Products bear marks which are confusingly similar to Plaintiff's Mark, defendants have distributed, offered for sale, and/or sold their Infringing Products to the consuming public in direct competition with Plaintiff's sale of genuine Plaintiff's Products, in or affecting interstate and intrastate commerce.

37     Defendants' use of copies or simulations of plaintiff's Mark is likely to cause and is causing confusion, mistake and deception among the general

purchasing public as to the origin of the Infringing Products, and is likely to deceive the public into believing that the Infringing Products being sold by defendants originate from, are associated with or are otherwise authorized by Plaintiff, all to the damage and detriment of Plaintiff's reputation and goodwill.

38.    Plaintiff is suffering and will continue to suffer irreparable harm and injury to its goodwill and reputation if defendants' activities are not enjoined, and plaintiff has no adequate remedy at law.

## COUNT TWO

### UNFAIR COMPETITION AND FALSE
### DESIGNATION OF ORIGIN (15 U.S.C. § 1114)

39.    Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

40.    The Infringing Products sold by defendants are of the same general nature and type as plaintiff's Licensed Products and, as such, defendants' use of the Mark is likely to cause confusion to the general purchasing public.

41.    By misappropriating and using plaintiff's Mark and trade dress, defendants misrepresent and falsely describe to the general public the origin and source of the Infringing Products and create a likelihood of confusion by ultimate purchasers as to both the source and sponsorship of such merchandise.

42.    Defendants' unlawful, unauthorized and unlicensed offer for sale and/or sale of the Infringing Products creates express and implied misrepresentations that their Infringing Products were created, authorized or approved by plaintiff, all to Defendants' profit and Plaintiff's great damage and injury.

41.    Defendants' aforesaid acts are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a), in that Defendants' use of Plaintiff's Mark, in connection with their goods and services, in interstate commerce constitutes a false designation of origin and unfair competition.

42.    Plaintiff has no adequate remedy at law and, if the defendants' activities are not enjoined, Plaintiff will continue to suffer irreparable harm and injury to its goodwill, reputation and the value of the Mark.

## COUNT THREE

### FEDERAL TRADEMARK DILUTION
### (15 U.S.C. § 1125 [c] )

43.    Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

44.    Plaintiff's Mark is a "famous mark" within the meaning of § 43 (c) of the Lanham Act, **15 U.S.C. § 1125 (c) (1)** and has been a famous mark prior to defendants' conduct as alleged herein.

45.    Defendants' distribution, sale and/or offer for sale in commerce of the Infringing Products dilutes the distinctive quality of plaintiff's Mark, and was done with notice and full knowledge that such importation, distribution, sale and/or offer for sale was not authorized or licensed by plaintiff.

46.    Defendants' aforesaid acts are in knowing and willful violations of Plaintiff's rights under section 43 (c) of the Lanham Act, **15 U.S.C. § 1125 ©**.

47.    Plaintiff has no adequate remedy at law and, if defendants' conduct is not enjoined, plaintiff will continue to suffer irreparable harm and injury to its good-

will, reputation and the value of the Mark.

48.     As a result of defendants' activities, plaintiff has been damaged in an amount to be ascertained, but no less than $200,000.00.

## COUNT FOUR

### COMMON LAW TRADEMARK AND
### TRADE NAME INFRINGEMENT

49.     Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

50.     Plaintiff has built up valuable goodwill in its Mark and trade name.

51.     With full knowledge of the fame of plaintiff's Mark and trade name, defendants are trading on the goodwill associated with plaintiff's Mark and trade names and are misleading the public into assuming a connection between the Infringing Products and plaintiff.

52.     Defendants' unauthorized use of Plaintiff's mark and trade name on the Infringing Products is likely to and does permit defendants to pass off the Infringing Products to the general public as that of Plaintiff, all to the detriment of Plaintiff and the unjust enrichment of defendants.

51.     Defendants' acts of trademark and trade name infringement causes confusion and misleads and deceives the public as to the source of defendants' Infringing Products, permits defendants to pass off the Infringing Products, permits defendants to pass off the Infringing Products as plaintiff's merchandise, and falsely suggests a connection between defendants and plaintiff and will continue to do so, in violation of the common law of the State of New York.

52.    Defendants' acts of trademark and/or trade name infringement have caused and will continue to cause plaintiff irreparable harm unless restrained by this Court.  Plaintiff has no adequate remedy at law.

**COUNT FIVE**
**BREACH OF CONTRACT**
**(Failure to Pay Royalties)**

53.    Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

54.    Defendant Ziari agreed to pay plaintiff royalties equal to 5% of defendants' net sales of the Licensed Products under the Licensing Agreement.  It also agreed to timely and accurately report all sales of the License Products.

55.    Defendant Ziari knowingly withheld reporting sales of the Licensed Products and converted royalties due to Fashion World.

56.    Defendant Ziari breached its contract with Fashion World.

57.    Fashion World has performed all of its duties and obligations and has fulfilled any and all conditions, if any, required of it under the License Agreement.

58.    By reason of defendant Ziari's breach and by virtue of the fore-going, Fashion World has been damaged in an amount to be determined according to the proof at trial, but believed to be in excess of Two Million Dollars ($2,000,000.00), composed of direct, incidental and consequential damages.

## COUNT SIX

## BREACH OF COVENANT OF
## GOOD FAITH AND FAIR DEALING

59.     Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

60.     Defendant Ziari had a duty to perform its obligations under the License Agreement and to refrain from acting to deprive plaintiff of the benefits due to it thereunder, in accordance with the implied contractual duty of good faith and fair dealing inherent in every contract.

61.     Defendant Ziari breached its duty of good faith and fair dealing by, inter alia, concealing and misrepresenting to plaintiff the amounts of its sales of Licensed Products.

62.     By virtue of the foregoing, Fashion World has suffered damages in an amount to be determined according to the proof at trial, but believed to be in excess of Two Million Dollars ($2,000,000.00), composed of direct, incidental and consequential damages.

## COUNT SEVEN

## BREACH OF CONTRACT (exclusivity)

63.     Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

64.     Defendant agreed to sell the Licensed Products only to Costco, Sam's and BJ's, the only authorized channels of distribution under the License Agreement.

65.     Defendant Ziari and its agents, USM and MOT, have sold certain products bearing the Mark to customers other Costco, Sam's and Bjs.

66.     Fashion World has performed all of its duties and obligations and has fulfilled any and all conditions, if any, required of it under the License Agreement.

67.     Fashion World has no adequate remedy at law, and if defendants' activities are not enjoined, Plaintiff will continue to suffer irreparable harm and injury to its goodwill and reputation and the value of the Mark.

## COUNT EIGHT

## INTERFERENCE WITH PROSPECTIVE ADVANTAGE

68.     Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

69.     Defendants were expressly aware of the prospective royalty payments upon which Fashion World relied in granting the valuable License in Exhibit A to defendant Ziari.

70.     Such prospective royalties were a protected interest of plaintiff as the owner and Licensor of the Mark.

71.     By converting and concealing royalties due to Fashion World, defendants intentionally and without justification interfered with that interest of plaintiff.

72.     But for defendants' interference, the prospective royalties would have been paid to plaintiff.

73.     Defendants' deceptive and tortious acts and practices involve sales activities to the general public of a recurring nature and have irreparably harmed

plaintiff. Plaintiff will continue to suffer irreparable harm unless defendants are enjoined to provide an accounting to plaintiff of their sales of products bearing the Mark.

## COUNT TEN

## QUANTUM MERUIT

74.    Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

75.    Defendants have benefitted by doing business with certain third parties by wrongfully selling Plaintiff's Licensed Products to entities other than to Costco, Sam's and Bjs, its sole authorized channels of distribution under the License Agreement.

76.    Defendants have concealed and converted royalties due plaintiff derived from their sales of Plaintiff's Licensed Products.

## COUNT ELEVEN

## UNJUST ENRICHMENT

77.    Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

78.    Defendants profited from sales of the Licensed Products by and through Ziari's role as licensee.

79.    By reason of defendants' wrongful conduct, including without limitation defendants' misrepresentations to and concealments from Plaintiff, defendants have been unjustly enriched by withholding royalties due to plaintiff in violation of its rights.

80.    None of the defendants have made restitution to plaintiff of any part of the royalties to which plaintiff is entitled.

## COUNT TWELVE

## UNFAIR COMPETITION UNDER NEW YORK LAW

81.    Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

82.    Plaintiff has built up valuable good will in the Mark and the distinctive quality of its genuine Licensed Products.

83.    Defendants' unauthorized distribution and "sublicense" to E-Bay and others, of Plaintiff's Licensed Products, and their use of the Mark is likely to and does permit defendants to palm off defendants' infringing goods as those of Plaintiff, all to the detriment of Plaintiff and the unjust enrichment of defendants.

84.    Defendants, with full knowledge of the fame of the Mark, intended to and have traded on the goodwill associated with the Mark, and have misled and will continue to mislead the public into assuming a connection between themselves and plaintiff by their importation, distribution, sale and/or offer of sale of the unlicensed, unauthorized products.

85.    Defendants' unauthorized use of the Mark has caused and is likely to continue to cause plaintiff damage by tarnishing the valuable reputation and public perception of plaintiff and its genuine goods.  Defendants have further palmed off their goods as plaintiff's goods by misrepresenting to the consuming public, members of whom are likely to and do believe that the unlicensed products emanate from or are associated with Plaintiff.

86.     The acts of defendants, which permit and accomplish confusion, mislead and deceive the public as to the source of defendants' goods, permit and accomplish palming off of defendants' goods as those of plaintiff and falsely suggest a connection with plaintiff, constitute acts of unfair competition with plaintiff in violation of the laws of the State of New York.

87.     Defendants' willful deceptive acts have caused and will continue to cause plaintiff irreparable harm unless enjoined by this Court and plaintiff has no adequate remedy at law.

## COUNT THIRTEEN

### UNLAWFUL DECEPTIVE ACTS AND PRACTICES
### (New York General Business Law § 349)

88.     Plaintiff repeats and realleges its statements made in Paragraphs 1 through 33 above with the same force and effect as if fully stated hereat.

89.     Defendants, without plaintiff's authorization or consent, and having knowledge of plaintiff's well-known and prior rights in the Mark, and knowing that defendants' unlicensed products bear marks which are confusingly similar to plaintiff's Mark, have imported, distributed, offered for sale and/or sold the infringing products to the consuming public in direct competition with plaintiff's right to receive the benefit of authorized sales of genuine merchandise.

90.     Defendants' use of copies or simulations of the Mark is likely to cause and is causing confusion, mistake and deception among the general purchasing public as to the origin of defendants' infringing and unlicensed products and is likely to

deceive the public into believing the infringing products being sold by defendants originate from, are associated with, or are otherwise authorized by Plaintiff.

91.    Defendants' deceptive acts and practices involve sales to the general public of a recurring nature.

92.    Plaintiff has no adequate remedy at law and, if defendants' activities are not enjoined, plaintiff will continue to suffer irreparable harm and injuries to its goodwill and reputation and the value of the Mark through the improper activities of defendants.

WHEREFORE, plaintiff demands judgment:

1.    Enjoining and restraining defendants, their shareholders, directors, officers, employees, agents, servants, parents, affiliates, insiders attorneys, confederates, and all other persons acting for, with, by, through or under them, first preliminarily enjoined and restrained, at first during the pendency of this action and, thereafter, permanently:

A.    from using in any manner the plaintiff's Mark, alone or in combination with any word, symbol, or words which so resemble said trademark as to be likely to cause confusion, deception, or mistake on or in connection with the advertising,  offering for sale, or sale of any product not plaintiff's, or not authorized or licensed by plaintiff to be sold in connection with plaintiff's Mark;

B.    from passing off, inducing, or enabling others to sell or pass off any product as and for products produced by plaintiff, not plaintiff's, or not produced under the control and supervision of plaintiff and approved, licensed and authorized by plaintiff for sale under plaintiff's Mark;

C.     from committing any acts calculated to cause purchasers to believe that defendants' products are those sold under the control and supervision of plaintiff, or sponsored or approved by, or licensed by, or connected with, or guaranteed by, or produced under the control and supervision of plaintiff;

D.     from otherwise competing unfairly with plaintiff in any manner;

E.     from shipping, delivering, distributing, returning or otherwise disposing of, in any manner, products or inventory not manufactured by or for plaintiff, nor authorized nor licensed by plaintiff to be sold or offered for sale, and which bear the Mark.

F.     Directing defendants to forthwith deliver up to plaintiff any and all products, guarantees, circulars, price lists, labels, signs, prints, packages, wrappers, pouches, receptacles, advertising matter, promotional, and other materials in the possession of defendants or under their control bearing any of the Mark, or each of them alone or in combination with any other words, or used in connection with the importation, distribution, advertising, offering for sale or sale of products not plaintiff's, or not made under the authorization and control of plaintiff;

G.     directing defendants to deliver to plaintiff a complete list of customers and other entities to which they have distributed and/or sold products bearing the Mark, or products not authorized or licensed by plaintiff to be sold in connection with the Mark;

H.     directing defendants, within thirty (30) days after service of an Order or Judgment wiith notice of entry thereof upon it, to file with the Court and serve upon plaintiff a written report under oath setting forth in detail the manner in which

defendants have complied with Paragraphs 1 through 4, *supra*, and to comply with any and all other proper notices and demands for disclosure;

I.      directing defendants to account for sales and profits realized by them by reason of defendants' unlawful acts herein alleged, to pay over the royalties due, and that the amount of damages for defendants' unlawful distribution, sale and offers to sell Licensed Products to entities other than the authorized channels of distribution be increased by a sum not exceeding three times the amount thereof as provided by law;

2.      After trial, entering a money judgment in favor of plaintiff against defendants, individually, or jointly and severally, in the amount of at least Four Million Dollars ($4,000,000.00).

3.      Granting plaintiff reasonable attorneys fees and such other and further relief as the Court may deem equitable under applicable federal and New York state laws.

Dated:      New York, New York
            June 27, 2007

                        BALLON STOLL BADER & NADLER, P.C.


                        By: _____
                              Vano I. Haroutunian (VH1010)
                              *Attorneys for Plaintiff*
                              1450 Broadway – 14th Floor
                              New York, New York 10018
                              (212) 575-7900

**Exhibit A**



# LICENSE AGREEMENT

LICENSE AGREEMENT dated as of January 26, 2005, between FASHION WORLD, LTD., a BVI corporation, for itself and its affiliates ("Licensor"), and ZIARI, LLC, a California limited liability company ("Licensee").

WHEREAS, Licensor is engaged in the business of licensing the design, manufacture, distribution and promotion of high quality fashion apparel and is authorized to license the Trademark defined herein;

WHEREAS, Licensee is in the business of designing, manufacturing, promoting and selling apparel and desires to obtain the right to use the Trademark in connection with the design, manufacture, promotion and sale of Licensed Products to Authorized Channels of Distribution in the Territory, as such terms are defined herein; and

WHEREAS, Licensor is willing to grant the license provided herein;

NOW, THEREFORE, the parties hereto, in consideration of the premises hereof and other good and valuable consideration, hereby agree as follows:

## I
## DEFINITIONS

1.1    <u>Definitions</u>.  The following terms used herein shall have the meanings given to such terms below:

"This Agreement" means this License Agreement among Licensor and Licensee.

"Authorized Channels of Distribution" means the superstores: Costco, Sams and BJs.

"Confidential Information" means non-public information received from a party to this Agreement, including financial information, operating procedures and techniques, concepts, drawings, designs, samples, promotional materials, marketing and sales strategies and procedures, and all other information labeled "Confidential" by such party with reference to this Agreement.

"Contract Year" means, for the 1st Contract Year, the period from the execution hereof until December 31, 2005; and for Contract Years thereafter, the calendar years ending on December 31, 2006, 2007, and 2008 and if this Agreement is extended pursuant to Section 12.1 hereof, also the calendar years ending on December 31, 2009 and 2010.

"License" means the license granted by Licensor to Licensee pursuant to Section 2.1 hereof.

"Licensed Products" means undergarments, underwear, lingerie, socks, loungewear and active wear (including, without limitation, athletic wear, track suits, warm-up suits, sweat shirts and jackets), sportswear, casual wear, dress wear (including pants, tops, shirts, sweaters, knitwear and jackets and

1

other outerwear), shoes, handbags, eyewear and accessories and pet products and accessories when bearing the Trademark.

"Licensee" means Ziari, LLC, a California limited liability company.

"Licensor" means Fashion World, Ltd., a BVI corporation.

"Manufacturer" means, with respect to any Licensed Products, the manufacturer thereof and any affiliates of such manufacturer.

"Net Sales" means the aggregate amount received by Licensee during the period for which Royalties are being computed for the sale of Licensed Products sold by Licensee, less (i) freight, and (ii) returns for which refunds of amounts previously subject to Royalties are made.

"Royalties" means royalties equal to 5% of Net Sales of Licensed Products payable by Licensee with respect to any specified period.

"Term hereof" means the period of three Contract Years ending on December 31, 2007, subject to the rights of termination and renewal provided for herein.

"Territory" means the United States and its territories, protectorates and possessions, Canada and Mexico.

"Trademark" means the trademark "F by Fortuna Valentino" and any other trademark of Licensor which Licensor permits to be sold to or through warehouse clubs or other discount stores.

## II
## LICENSE

2.2    **Grant of License.**  Licensor hereby grants to Licensee the exclusive right and license to use the Trademarks in the Territory during the term hereof in connection with the design, manufacture, advertising, promotion, marketing, sale and distribution of Licensed Products; provided, however, that Licensee shall not be permitted to use the Trademarks in connection with sales to customers unless such customers are (i) Authorized Channels of Distribution, and (ii) reasonably believed by Licensee not to be purchasing for resale outside the Territory.  Licensor reserves the right to use, and/or grant a license or sublicense to any third party to use, the Trademarks in the Territory during the term hereof in connection with the design, manufacture, advertising, promotion, marketing, sale or distribution of products in the categories included in Licensed Products to customers other than Authorized Channels of Distribution, subject to the restriction that Licensor shall not use, or authorize any third person to use, within or outside the Territory designs copied from or based upon designs developed by Licensee pursuant to this Agreement, provided however that no such license shall permit Licensed Products or products which are competitive to them to be sold to Mass Merchants other than through full price Department Stores such as Macy's, Nordstroms, Robinsons May, Sak's and the like.  Licensee shall not be permitted hereby to grant any sublicense of the Trademark to any third party.



2.3    **Use of Licensed Legend.**  Licensee shall be required to:

       2.3.1    position the Trademark on Licensed Products, including labels, in such manner as is approved by Licensor; and

       2.3.2    place on Licensed Products and all hangtags, boxes, tissue paper using a logo, and other wrapping and packaging used in connection therewith, in such manner as is approved in writing by Licensor, the legend "Licensed by Fashion World," or such other legend which indicates that Licensed Products were manufactured or imported, sold and distributed within the Territory under the License from Licensor.

2.4    **Sale of Products.**  Licensee shall use commercially reasonable efforts to exploit the Trademark during the term hereof in respect of Licensed Products and to make and maintain adequate arrangements for the distribution, shipment and sale necessary to meet demand for Licensed Products in the Territory by Authorized Channels of Distribution, so as to maximize sales consistent with the quality and reputation of Licensor and the overall business of Licensee.

2.5    **Labor Laws.**  It is Licensor's policy to require that all Licensed Products be manufactured only by Manufacturers complying with (i) any labor-law requirements in the country of manufacture, and (ii) the requirements set forth below.  Licensee agrees to comply with such laws and requirements and to use reasonable efforts to cause any Manufacturer, acting with respect to Licensed Products, (x) to be aware of Licensor's said policy and agree to comply therewith, (y) to take steps to assure that neither prison nor military labor is used in the manufacture of Licensed Products and (z), where manufacturing is performed in countries which do not establish a legal minimum age for child labor or establish a minimum age of less than 14 years of age, to agree to take steps to assure that the labor of children of less than 14 years of age is not used in the manufacture of Licensed Products.  Licensee shall obtain from each of its Manufacturers its duly executed certification of the foregoing agreements for the benefit of Licensor, a copy of each of which shall be delivered to Licensor.

### III
### MANUFACTURING

3.1    **Manufacturing.**  Licensee shall be permitted to manufacture or arrange for the manufacturing of any Licensed Products in such country or countries as it may select, provided that (i) the Manufacturer represents in writing that it will comply with the requirements of Section 2.4 hereof, (ii) the Manufacturer agrees in writing not to manufacture products for any person other than Licensee which are intended to be sold under any trademark or logo of Licensor or any of its affiliates, and (iii) Licensee shall arrange to allow Licensor to examine any such manufacturing facility and production runs of Licensed Products at any reasonable times during business hours.  Notwithstanding the foregoing, Licensor shall have the right at any time to prohibit the use of a Manufacturer or proposed Manufacturer if Licensor reasonably determines that such Manufacturer (x) has made and/or sold unauthorized copies of Licensed Products, or is known in other circumstances to have made and/or sold unauthorized copies of the products of others, or (y) has repeatedly manufactured Licensed Products which fail to meet the quality requirements hereof.  Licensee shall be responsible for the supervision of, and payment for, the

manufacturing of all Licensed Products, shall manufacture Licensed Products in accordance with designs and samples approved by Licensor, and shall indemnify Licensor and its affiliates against any and all claims for repair or replacement of defective products. From time to time, at the request of Licensor, Licensee shall send Licensor samples of Licensed Products or other evidence agreed on by the parties demonstrating that such Licensed Products are being manufactured in accordance with the quality standards required hereunder.

      3.2    <u>Product Liability Insurance</u>. Licensee shall obtain from a licensed insurer qualified to do business in the State of California, and maintain in full force and effect at its own expense for all Licensed Products sold by Licensee, products liability coverage in an amount not less than $2,000,000, combined single limit, with respect to Licensed Products, such coverage to be comparable with coverage maintained for other products distributed by Licensee. Such coverage may be part of a blanket policy maintained by Licensee in connection with such other products and shall provide protection against all claims, demands and causes of action arising out of product liability. Such insurance shall name Licensor as an additional insured, and shall provide for at least ten-days' prior written notice to Licensor and Licensee from the insurer in the event of any modification, cancellation or termination thereof. Licensee shall from time to time, upon reasonable request by Licensor, furnish or cause to be furnished to Licensor evidence, such as a certificate of insurance, of the maintenance of the insurance as herein required.

      3.3    <u>Designs</u>. Licensee shall be responsible for the design of Licensed Products, working in cooperation with Licensor. Such designs shall be appropriate to enhance and preserve the reputation of the Trademark and shall not be used unless approved by Licensor as required in Article VI hereof. All designs developed by Licensee shall be deemed to have been developed exclusively by Licensee for use by Licensee, and with respect to all designs which are actually sold by Licensee bearing the Trademarks during the period of this agreement neither Licensee nor Licensor shall use, permit, license or authorize any other person to use such designs for any products other than with the consent of both Licensor and Licensee. During the term of this agreement, Licensor may obtain a license to use designs and/or products developed by Licensee outside the Territory on such terms as may be agreed between Licensor and Licensee.

      3.4    <u>Licensor's Right to Purchase</u>. Licensor shall have the right to require Licensee to sell to Licensor such quantity of Licensed Products as Licensor may order, for a price reflecting a discount of 10% from Licensee's normal wholesale prices; <u>provided</u>, <u>however</u>, that Licensor's orders for such Licensed Products shall be submitted to Licensee at the times that Licensee normally accepts orders for such Licensed Products in such quantities. Sales to Licensor pursuant to this Section shall not be subject to Royalties.

IV

## ROYALTIES

4.1    **Royalties.**  In consideration of Licensor's grant to Licensee of the right and license to use the Trademark, Licensee shall pay to Royalties to Licensor with respect to the sale of Licensed Products in accordance with the terms and conditions of this Agreement. Such Royalties shall be paid by Licensee to Licensor quarterly not later than the 15th days of January, April, July and October of such Contract Year, beginning April 15, 2005, with respect to Royalties accrued but unpaid through the end of the immediately preceding calendar quarter; provided, however, that Licensee shall pay $10,000 to Licensor upon the execution hereof, which $10,000 shall be credited against Royalties otherwise first payable hereunder.

4.2    **Manner of Payment.**  All payments by Licensee to Licensor hereunder shall be made by check or wire transfer as Licensee may elect. If made by wire transfer, payment shall be to an account to be designated by Licensor, with a copy of an advice relating thereto faxed to Licensor as provided in Section 13.7 hereof.

4.3    **Taxes.**  Licensee shall bear all taxes, duties and other governmental relating to or arising under this Agreement, including income, sales, use, value-added and excise taxes and any other charges relating to or imposed on any Royalties payable by Licensee to Licensor hereunder.

V
## ACCOUNTING STANDARDS

5.1    **Books and Records.**  All computations relating to the determination of the amount of Royalties due and payable pursuant to this Agreement shall be made in accordance with generally accepted accounting principles in the United States. Licensee shall permit Licensor or its duly authorized representatives, at Licensor's expense, full access to all records and documents relating to the computation of Royalties due hereunder at mutually convenient times during Licensee's usual business hours for inspection purposes, except that in the event that any inspection by or on behalf of Licensor reveals that the amount paid to it for any Contract Year is less by at least 7% than the amount due hereunder, the cost of such inspection shall be payable by Licensee without prejudice to other claims by Licensor and the amount not paid when due shall be paid by Licensee to Licensor promptly upon the determination of the amount so due with interest from the date payment of the additional amount is demanded at a rate equal to 2% per annum above the prime rate charged from time to time by a major money-center bank selected for such purpose by Licensor.

5.2    **Statements.**  Licensee agrees to submit to Licensor along with each payment of Royalties a statement, signed and certified by a duly authorized officer in charge at Licensee, showing the gross amount of sales of Licensed Products during such calendar quarter, broken down by jurisdiction in which such sales occurred and otherwise into reasonable categories, together with all discounts and allowances given and returns credited, and a report summarizing the progress of the business with respect to the Licensed Products during such calendar quarter.

5

## VI
## APPROVALS

6.1    <u>Approvals</u>.  Licensor has the right to approve or disapprove each of the following in its sole discretion (any such approval or disapproval to be given as provided in Section 6.2 hereof):

(a)    The selection of any Manufacturer of Licensed Products hereunder;

(b)    The design, quality and taste of Licensed Products, which approval shall be required before Licensee may make any line-opening or start production or sales of such Licensed Products;

(c)    The position of the Trademark on Licensed Products and the placement on Licensed Products and all wrapping or packaging used in connection therewith of the legend required by Section 2.2(b) hereof; and

(d)    Any advertising and sales promotion materials in relation to the promotion of image and reputation of the Trademark and the Licensed Products, including any catalogues and brochures showing the Trademark or products bearing the Trademark, which approval shall be required before the release, publication and/or production of such material or catalogues.

6.2    <u>Approval or Disapproval</u>.  Licensor shall be required to deliver to Licensee a written approval or disapproval of any prototypes of Licensed Products, actual Licensed Products and/or advertising and sales-promotion materials within 5 calendar days after receipt of a written request therefor from Licensee.  In the event that Licensor disapproves of such items and/or materials, Licensor shall state the reasons therefor, including identification of any items or materials Licensor considers inappropriate, so that Licensee may, if possible, correct or cure any defect therein.  Items not disapproved in writing within the aforesaid 5-day period shall be deemed to have been approved.

## VII
## QUALITY OF LICENSED PRODUCTS

7.1    <u>Quality Standard</u>.  Licensee shall use its best efforts to assure that Licensed Products shall be of such high quality as may be required and approved by Licensor in order to maintain the good reputation of the Trademark.

7.2    <u>Samples</u>.  In order to assure the quality of the Licensed Products, Licensee shall submit to Licensor free of charge a reasonable number of representative samples of prototypes of all Licensed Products prior to the date of commencement of manufacture of such Licensed Products, and a reasonable number of representative samples of the actual Licensed Products prior to the date of commencement of sale thereof, for inspection purposes.  In addition, a reasonable number of representative samples of any advertising and sales-promotion materials or documents shall be submitted by Licensee to Licensor prior to the production or actual use thereof.  What constitutes a reasonable number hereunder shall be

determined by Licensee. The foregoing is in addition to Licensee's responsibility to furnish Licensor with samples of all Manufactured Products ordered by Licensor from Licensee pursuant to Section 3.4 hereof or for editorial purposes, for which samples Licensor shall pay Licensee a price equal to Licensee's production cost (excluding any developmental costs). SAMPLES AT NO COST.

VIII

ADVERTISING AND SALES PROMOTION

8.1    **Promotional Policies.** Licensee may, in its discretion, promote and advertise Licensed Products in the Territory and shall communicate to Licensor quarterly in reasonable detail any promotional and advertising policies, plans, photographs, press kits, and budgets for the current and forthcoming period.

IX

TRADEMARKS

9.1    **Registration.** Licensor hereby represents to Licensee that (i) it is fully authorized to grant the License provided for herein, and (ii) the Trademark has been registered in each jurisdiction contained in the Territory.

9.2    **Policing and Defending Trademark.** Licensee shall notify Licensor of any apparent infringement of the Trademark in the Territory by, or dispute in respect of the Trademark or related intellectual property with, any third party of which it becomes aware. To the extent that any such infringement or dispute is caused solely by the malfeasance of Licensee hereunder, Licensee shall take, at its own expense, such action with respect thereto as it deems reasonable. If Licensee fails to take such action and Licensor determines that action is necessary to protect a Trademark with respect to Licensed Products in the event of any such infringement or dispute, as aforesaid, Licensor shall be permitted to take such action and to obtain from Licensee reimbursement for the cost thereof (including attorney's fees and expenses). To the extent that any such infringement or dispute is not caused solely by the malfeasance of Licensee hereunder, Licensor shall take, at its own expense, such action as it deems reasonable to protect its rights in the Trademark and Licensee's rights hereunder and Licensee shall cooperate therewith in all reasonable respects at Licensor's expense, including acting as plaintiff and executing pleadings. If Licensor fails to take such action, Licensee shall have the right to do so, at Licensee's sole cost and expense, subject to Licensor's consent (which shall not be unreasonably withheld), in which case Licensee shall be entitled to retain any amount recovered therefrom after reimbursing both parties for any expenses incurred in connection therewith; provided, however, that if Licensor fails to take such action and it is determined that such infringement or dispute would have a materially adverse effect on Licensee's business, the amount of any Royalties due to Licensor shall be applied to reimburse the cost and expense of such action taken by Licensee.

9.3    **Documents.** Licensee shall have the right to register or record its right to use the Trademark. Not later than six months after the expiration or termination of this Agreement, Licensee

shall provide such documents as may be necessary to enable Licensor to cancel any such registration or recordation which reflects that Licensee is an authorized user of the Trademark.  Any expenses for such registration or recordation and cancellation shall be borne by Licensee.

## X
## REPRESENTATIONS AND WARRANTIES

10.1     **Representations of Licensor.**  Licensor hereby represents to Licensee that at the time of execution and at all times during this agreement:

(a)     Licensor is a corporation duly formed and validly existing under the laws of the BVI with the power and authority to execute, deliver and perform the terms of this Agreement;

(b)     upon the execution and delivery by the parties hereto, this Agreement will constitute the legal, valid and binding obligation of Licensor, enforceable according to its terms;

(c)     the execution and delivery hereof shall not violate any agreement, covenant or obligation by which Licensor or any of its property is bound;

(d)     Licensor has full power and authority to grant the license to Licensee provided for herein;

(e)     the Trademark has been registered in each jurisdiction contained in the Territory; and

(f)     no claim has been asserted against Licensor that the Trademark or any license thereof infringes on the trademark or other intellectual property rights of any third party.

10.2     **Representations of Licensee.**  Licensee hereby represents to Licensor, as follows:

(a)     Licensee is a limited liability company duly formed and validly existing under the laws of California with the power and authority to execute, deliver and perform the terms of this Agreement;

(b)     upon the execution and delivery by the parties hereto, this Agreement will constitute the legal, valid and binding obligation of Licensee, enforceable according to its terms; and

(c)     the execution and delivery hereof shall not violate any agreement, covenant or obligation by which Licensee or any of its property is bound.

## XI
## INDEMNIFICATION

11.1     **Indemnification by Licensee.**  Licensee hereby agrees to indemnify and hold harmless

Licensor, its directors, officers, employees, agents and affiliates ("Licensee's Indemnitees") from and against any and all losses, liabilities, damages and expenses (including reasonable attorneys' fees and expenses) which Licensee's Indemnitees or any of them may incur or be obligated to pay in any action, claim or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or suffered by Licensee or any of its servants, agents or employees in connection with Licensee's performance of this Agreement provided such action, claim or proceeding does not arise from a breach or default in an obligation owed to Licensee by Licensee's Indemnitees or any of them. .  Licensor shall promptly notify Licensee of any suit or claim against Licensor relating to Licensed Products, the Trademark and/or this Agreement which may give rise to a claim under this Section.

      **11.2**     **Indemnification by Licensor**.  Licensor hereby agrees to indemnify and hold harmless Licensee, its directors, officers, employees, agents and affiliates ("Licensor's Indemnitees") from and against any and all losses, liabilities, damages and expenses (including reasonable attorneys' fees and expenses) which Licensor's Indemnitees or any of them may incur or be obligated to pay in any action, claim or proceeding against them or any of them, for or by reason of any acts, whether of omission or commission, that may be committed or suffered by Licensor or any of its servants, agents or employees in connection with Licensor's performance of this Agreement provided such action, claim or proceeding does not arise from a breach or default in an obligation owed to Licensor by Licenor's Indemnitees or any of them.   Licensee shall promptly notify Licensor of any suit or claim against Licensee relating to Licensed Products, the Trademark and/or this Agreement which may give rise to a claim under this Section.

**XII**

**TERM AND TERMINATION**

      **12.1**     **Term**.  This Agreement shall become effective as of the date of execution hereof and shall continue in full force and effect thereafter until December 31, 2008.  In the event that (i) Licensee shall achieve at least $25,000,000 of Net Sales of Licensed Products during any  Calendar Year during the period ending on December 31, 2008, and (ii) is not then in default hereunder, Licensee may extend this Agreement for an additional period of two years (ending December 31, 2010) upon written notice thereof given (subject to satisfaction of the foregoing requirements as of the end of 2008) by Licensee to Licensor not later than September 1, 2008.

      **12.2**     **Termination for Cause**.  Licensor has the right to terminate this Agreement for cause in the event that (i) Licensee has, in a material respect, breached, or failed to comply with, any covenant or provision of this Agreement; (ii) in the event that in any Contract Year commencing with calendar year 2006 Licensee shall fail to achieve Net Sales of Licensed Products of at least $2,000,000; or (iii) following written notice from Licensor to Licensee to the effect that Licensee has repeatedly been late in making deliveries of Licensed Products to major accounts as the result of which the image and/or reputation of either Licensor or the Trademark has been seriously damaged, but only if such pattern of late deliveries shall not have been remedied within a period of 120 days after the delivery of such notice.  A termination pursuant to this paragraph may be effected by Licensor only where Licensor has given written notice thereof to Licensee identifying the breach or circumstance for which the termination is being effected and

Licensee fails to rectify or cure such breach or circumstance. Except as otherwise specifically provided herein, a termination pursuant to clause (i) of this Section may be effected by Licensor only in the event of the failure of Licensee to rectify or cure such breach or circumstance (if curable) within 10 business days, in the case of a default in the payment of money to Licensor, or in other cases within 60 business days from the receipt by Licensee of written notice from Licensor identifying the breach or other circumstance giving rise to such right of termination; provided, however, that if such breach or circumstance (other than a breach relating to the payment of money) is of such nature that it cannot reasonably be cured within said time, such right of termination shall not be permitted to be exercised so long as Licensee is taking steps expeditiously and in good faith to rectify or cure such breach or circumstance as quickly as reasonably practicable. Any such right of termination shall be in addition to any rights or remedies available to Licensor at law or in equity.

12.3    **Termination by Licensee.**  Licensee may terminate this Agreement in the event that Licensor shall have breached this Agreement in a material respect and such breach shall continue uncured for a period of 30 days after written notice thereof given by Licensee to Licensor.

12.4    **Cessation of Manufacturing.**  Following the expiration of this Agreement pursuant to Section 12.1 hereof, or upon the earlier termination pursuant to Sections 12.2 or 12.3 hereof, Licensee shall not manufacture any additional Licensed Products, but may continue to manufacture the semi-finished Licensed Products at that time into the finished Licensed Products. Licensee shall submit to Licensor a list of inventory of all Licensed Products (both finished and semi-finished) then in the possession of Licensee. In the case of a termination pursuant to Section 11.2 hereof, Licensor shall have the right to require that Licensee sell any remaining inventory of Licensed Products to Licensor at a discount of 10% from Licensee's normal wholesale prices, it being understood that Royalties shall not be payable with respect to any such sales.

12.5    **Rights after Termination.**  Immediately following the expiration or termination hereof, Licensee shall remove all signage from any premises indicating a linkage or relationship between Licensee and Licensor or its affiliates. Except in the case of termination hereof for cause, Licensee shall be permitted to sell any remaining inventory of Licensed Products during the six months following the termination or expiration of this Agreement ("Sell-Off Period") and may use the Trademark, on a non-exclusive basis, on such Licensed Products and promotional items, advertising materials and samples in connection with such sales, after which period Licensee may sell any remaining inventory only if all labels, trademarks and other identification with Licensor or its affiliates has been cut out or otherwise removed. Royalties shall be paid by Licensee to Licensor as provided herein with respect to all Net Sales made during the Sell-Off Period, but in no event later than 30 days after the end thereof. For the purposes hereof, "cause" means failure to pay Royalties when due or the sale of Licensed Products without the approval of Licensor or to customers other than as permitted herein.

## XIII
## MISCELLANEOUS

13.1    **Surviving Provisions.**  Upon the expiration or termination of this Agreement, those provisions hereof which by their terms are not clearly intended to expire upon such expiration or

(a) if to Licensee, addressed to:

> Ziari, LLC
> 8737 Wilshire Blvd.
> Beverly Hills, CA 90211

> Attention: Mr. Jeff Green

with a copy to:

> Fenigstein & Kaufman
> 1900 Avenue of the Stars
> Los Angeles, CA 90067

> Attention: Ron S. Kaufman, Esq.
> Phone: 310-201-0777
> Fax: 310-556-1346

(b) if to Licensor, addressed to:

> Paul Tusa, CPA
> 1818 Bellmore Avenue
> New York, NY 11710
> Phone: 516-785-4999
> Fax: 516-785-7882

> Attention: Dr. Bruno Condi

with a copy to:

> Ballon Stoll Bader & Nadler, P.C.
> 1450 Broadway
> New York, New York 10002

> Attention: Howard D. Bader, Esq.
> Phone 212-575-7900 X249
> Fax: 212-764-5060

or to such other address as either party hereto shall designate in writing to the other party.

13.8    Waiver.  A waiver by either party hereto of any particular default or breach by the other party shall not affect or prejudice the rights of the aggrieved party with respect to any other default or breach whether of the same or different nature.

**13.9    Assurances.** Each of the parties hereto shall do such further acts and things, including executing appropriate documents, as may reasonably be requested by the other party to carry out the intent of this Agreement.

**13.10    Binding Effect.** This Agreement shall be binding upon and shall inure to the benefit of each of Licensor and Licensee and their respective successors and permitted assigns.

**13.11    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed wholly within such jurisdiction.

**13.12    Jurisdiction and Venue.** Each of the parties hereto hereby consents to the exclusive jurisdiction of the State or Federal courts located in the Borough of Manhattan, New York, New York and agrees that any action concerning a dispute arising out of or relating to this Agreement shall be brought in any State or Federal court located in said Borough and that process, notice of motion, or other application of the court, or a judge thereof, or any notice in connection with the proceedings provided for herein may be served within or without the State of New York as provided herein for the serving of notices hereunder.

**13.13    Captions.** The captions heading each Article of this Agreement are for convenience only and shall have no effect on the interpretation on meaning of this Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed in its respective name and under its respective corporate seal by one of its officers thereunto duly authorized, as of the day and year set forth above.

FASHION WORLD, LTD.

By _____
Harmodio Herrera, Director/President

ZIARI, LLC

By _____

13

# Ziart International

January - May, 2006

| Invoice # | PO # | Customer | Ship Date | Quantity | Case Sz | US Price Per Item | Extended | Allow % | Net Sls Price | Comm % | Gross Amt | Item |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C107404 | 573-0337-250 | Costco Canada | 03/30/06 | 400 | | $ 13.45 | 5,380.00 | 3.75% | 5,178.25 | 4.00% | 208.91 | Lounge Set |
| C107453 | 571-0337-212 | Costco Canada | 03/28/06 | 400 | | $ 13.45 | 5,380.00 | 3.75% | 5,178.25 | 4.00% | 206.91 | Lounge Set |
| C107460 | 573-0330-287 | Costco Canada | 03/22/2006 | 600 | | $ 13.45 | 8,070.00 | 3.75% | 7,767.38 | 4.00% | 308.37 | Lounge Set |
| C107460 | 571-0317-011 | Costco Canada | 03/20/2006 | 600 | | $ 13.45 | 8,070.00 | 3.75% | 7,767.38 | 4.00% | 308.37 | Lounge Set |
| C107336 | 573-0217003 | Costco Canada New Club | 02/22/2006 | 800 | | 15.48 $ 13.47 | 26,900.00 | 3.50% | | 3.50% | 1,214.66 | Lounge Set |
| C107338 | 573-0217007 | Costco Canada New Club | 02/23/2006 | 600 | | 15.48 $ 13.47 | 8,081.74 | 3.50% | 7,798.88 | 2.55% | 184.97 | Lounge Set |
| 218638 | 920011924 | Costco Mexico | 02/24/2006 | 384 | | $ 16.00 | 18,183.48 | 3.50% | 18,587.76 | 2.55% | 380.84 | Lounge Set |
| 218658 | 920118522 | Costco Mexico | 02/27/2006 | 1,920 | | $ 11.40 | 6,144.00 | 0.75% | 6,097.92 | 3.00% | 304.90 | 3Pc Lounge Set |
| 221801 | 920118609 | Costco Mexico | 03/28/06 | 768 | | $ 16.50 | 21,888.00 | 0.75% | 21,723.84 | 5.00% | 1,056.19 | 3Pc Lounge Set |
| 301445 | 029502129 | Sam's USA | 01/18/06 | 480 | | $ 11.50 | 11,904.00 | 0.75% | 11,814.72 | 5.00% | 590.74 | 3Pc Lounge Set |
| 301646 | 049232E7180 | Sam's USA | 01/18/2006 | 720 | | $ 11.50 | 39,936.00 | 0.75% | 39,636.48 | 5.00% | 1,981.824 | Yoga Pant |
| 301821 | 049302799 | Sam's USA | 01/18/2006 | 120 | | $ 11.50 | 5,520.00 | 0.75% | 5,492.40 | 8.00% | 411.82 | Yoga Pant |
| 302268 | 349402627 | Sam's USA | 01/18/06 | 120 | | $ 11.50 | 8,280.00 | 0.75% | 8,238.60 | 5.00% | 411.93 | Yoga Pant |
| 301582 | 049362409 | Sam's USA | 01/18/06 | 120 | | $ 11.50 | 1,380.00 | 0.75% | 1,373.10 | 8.00% | 89.68 | Yoga Pant |
| 301623 | 049502749 | Sam's USA | 01/18/2006 | 240 | | $ 11.50 | 2,760.00 | 0.75% | 1,373.10 | 8.00% | 88.68 | Yoga Pant |
| 301624 | 049502749 | Sam's USA | 01/18/06 | 240 | | $ 11.50 | 2,760.00 | 0.75% | 1,373.10 | 8.00% | 89.68 | Yoga Pant |
| 301625 | 049502749 | Sam's USA | 01/18/2006 | 240 | | $ 11.50 | 2,760.00 | 0.75% | 2,746.20 | 8.00% | 137.31 | Yoga Pant |
| 301464 | 049502614 | Sam's USA | 01/18/06 | 120 | | $ 11.50 | 2,760.00 | 0.75% | 2,746.20 | 8.00% | 137.31 | Yoga Pant |
| 301627 | 052052273 | Sam's USA | 01/18/2006 | 120 | | $ 11.50 | 1,380.00 | 0.75% | 1,373.10 | 8.00% | 137.31 | Yoga Pant |
| 301628 | 052050422 | Sam's USA | 01/18/2006 | 440 | | $ 11.50 | 1,380.00 | 0.75% | 1,373.10 | 8.00% | 68.66 | Yoga Pant |
| 301629 | 062102115 | Sam's USA | 01/18/06 | 240 | | $ 11.50 | 5,520.00 | 0.75% | 5,492.40 | 8.00% | 274.62 | Yoga Pant |
| 301460 | 032202149 | Sam's USA | 01/18/2006 | 240 | | $ 11.50 | 2,760.00 | 0.75% | 2,746.20 | 8.00% | 137.31 | Yoga Pant |
| | 032462344 | Sam's USA | 01/18/2006 | 840 | | $ 11.50 | 9,660.00 | 0.75% | 2,746.20 | 8.00% | 137.31 | Yoga Pant |
| | 032562261 | Sam's USA | 01/18/2006 | 240 | | $ 11.50 | 2,780.00 | 0.75% | 2,746.20 | 8.00% | 137.31 | Yoga Pant |
| Return | | | | 460 | | $ 11.50 | 6,520.00 | 0.75% | 9,811.70 | 8.00% | 480.59 | Yoga Pant |
| | | | | | | $ 11.50 | (12,972.00) | 0.50% | (12,807.14) | 8.00% | 274.82 | Yoga Pant |
| C107339 | 484462417 | Sam's Canada | 02/25/06 | 1,820 | 16.00 | $ 13.91 | 26,713.04 | 0.50% | 40,843.76 | 8.00% | (945.38) | Yoga Pant |
| C107399 | 484632418 | Sam's Canada | 03/08/06 | 1,080 | 12.00 | $ 10.43 | 40,648.00 | 0.50% | 25,779.09 | 8.00% | 2,033.19 | Yoga Pant |
| 304431 | 833762207 | Sam's Puerto Rico | 05/0/06 | 612 | | $ 8.83 | 37,982.81 | 5.50% | 34,463.22 | 6.00% | 543.76 | Camisole8 briefs |
| 301407 | BSC172200 | BJSW | 2/3/2006 | 2,712 | | $ 11.29 | 5,466.16 | 5.50% | 5,184.576 | 6.00% | 239.23 | Camisole |
| 302234 | 9562106018 | Cost-U-Less | 3/8/2006 | 720 | | $ 6.28 | 30,818.48 | 0.00% | 30,818.48 | 8.00% | 1,530.92 | 3Pc Lounge Set |
| 302234 | 9562106018 | Cost-U-Less | 3/3/2006 | 678 | | $ 12.75 | 5,940.00 | 0.00% | 6,940.00 | 6.00% | 297.00 | Lounge Set |
| 300797 | 2668664 Price Smart | | 5/10/2006 | 768 | | $ 12.50 | 13,284.00 | 0.50% | 13,284.00 | 8.00% | 387.20 | Lounge Set |
| | | | | 6,120 | | | 9,860.00 | | 9,862.00 | | 84.20 | Lounge Set |
| | | | | 768 | | | 9,600.00 | | 9,662.00 | | 477.90 | Lounge Set |
| | | | | | | $ | | $ | 191,159.27 | $ | 10,462.13 | |

**Exhibit C**

## The Merchant of Tennis
## Commission Statement
## Fortuna Valentino

### 3rd Qtr 2006

| Invoice Number | Customer P.O. | Alpha Name | Ship Date | QTY | Price | Gross Amount | Allow. | Other Allow. | Net Sales | USD $'s 1.13/65 | Commission on Sales | Commissio n Amt. | Item Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 306333 | 6537825740 | Sam's Club P.R. | 7/17/06 | 936 | 8.50 | 7,956.00 | 0.50% | 0.00% | 7,916.22 | 7,916.22 | 2.50% | 197.91 | Camisola |
| 307415 | 5653782691 3 | Sam's Puerto Rico | 8/14/06 | 180 | 8.93 | 1,607.40 | 0.50% | 77.40 | 1,521.96 | 1,521.96 | 2.50% | 38.05 | Camisola |
| 305986 | 8489826288 | Sam's Club USA | 7/6/06 | 1,260 | 13.50 | 17,010.00 | 0.50% | 0.00% | 16,924.95 | 16,924.95 | 2.50% | 423.12 | Lounge Set |
| 306985 | 8495623063 | Sam's Club USA | 7/6/06 | 720 | 13.50 | 9,720.00 | 0.50% | 0.00% | 9,671.40 | 9,671.40 | 2.50% | 241.79 | Lounge Set |
| 306028 | 8234620995 | Sam's Club USA | 7/7/06 | 720 | 13.50 | 9,720.00 | 0.50% | 0.00% | 9,671.40 | 9,671.40 | 2.50% | 241.79 | Lounge Set |
| C107985 | 4854632988 | Sam's Club Canada | 7/25/06 | 648 | 17.00 | 11,016.00 | 0.50% | 3.00% | 10,830.44 | 10,830.44 | 2.50% | 234.84 | Lounge Set |
| 308183 | 6537827050 | Sam's PR | 9/12/06 | 1134 | 16 | 18,144.00 | 0.005 | | 18053.28 | 8,393.75 | 2.50% | 451.33 | Lounge Set |
| C108193 | 5710915021 | Costco Canada | 9/26/06 | 1440 | 15.25 | 21,960.00 | 0.0075 | 0.035 | 21026.7 | 18,053.28 | 2.50% | 472.00 | Lounge Set |
| C108194 | 5730918918 | Costco Canada | 9/26/06 | 1584 | 15.25 | 24,156.00 | 0.0075 | 0.035 | 23126.37 | 20,798.04 | 2.50% | 519.20 | Lounge Set |
| C108276 | 5730926026 | Costco Canada | 9/26/06 | 1008 | 15.25 | 15,372.00 | 0.0075 | 0.035 | 14716.69 | 13,216.03 | 2.50% | 330.40 | Lounge Set |
| 305702 | 8492826104 | Costco Canada | 7/5/06 | 720 | 8.25 | 5,940.00 | 0.50% | 0.00% | 5,910.30 | 5,810.30 | 2.50% | 147.76 | Tank Tops |
| 305703 | 8492820591 | Sam's Club USA | 7/5/06 | 480 | 8.25 | 3,960.00 | 0.50% | 0.00% | 3,940.20 | 3,940.20 | 2.50% | 98.51 | Tank Tops |
| 305704 | 8495620056 | Sam's Club USA | 7/5/06 | 480 | 8.25 | 3,960.00 | 0.50% | 0.00% | 3,940.20 | 3,940.20 | 2.50% | 98.51 | Tank Tops |
| 305705 | 8498820342 | Sam's Club USA | 7/5/06 | 960 | 8.25 | 7,920.00 | 0.50% | 0.00% | 7,880.40 | 7,880.40 | 2.50% | 197.01 | Tank Tops |
| 305981 | 8494823440 | Sam's Club USA | 7/8/06 | 240 | 8.25 | 1,980.00 | 0.50% | 0.00% | 1,970.10 | 1,970.10 | 2.50% | 49.25 | Tank Tops |
| 307091 | 8492620201 | Sam's Club USA | 8/4/06 | 168 | 8.25 | 1,386.00 | 0.50% | 0.00% | 1,379.07 | 1,379.07 | 2.50% | 34.48 | Tank Tops |
| 307092 | 8493823917 | Sam's Club USA | 8/4/06 | 240 | 8.25 | 1,980.00 | 0.50% | 0.00% | 1,970.10 | 1,970.10 | 2.50% | 49.25 | Tank Tops |
| 307053 | 8496820063 | Sam's Club USA | 8/4/06 | 240 | 8.25 | 1,386.00 | 0.50% | | 1,379.07 | 1,379.07 | 2.50% | 49.25 | Tank Tops |
| 307054 | 8496820868 | Sam's Club USA | 8/4/06 | 576 | 8.25 | 4,752.00 | 0.50% | | 4,728.24 | 4,728.24 | 2.50% | 118.21 | Tank Tops |
| 307055 | 8231623065 | Sam's Club USA | 8/4/06 | 144 | 8.25 | 1,188.00 | 0.50% | | 1,182.06 | 1,182.06 | 2.50% | 29.55 | Tank Tops |
| 307056 | 8206623831 | Sam's Club USA | 8/4/06 | 192 | 8.25 | 1,584.00 | 0.50% | | 1,576.08 | 1,576.08 | 2.50% | 39.40 | Tank Tops |
| 307057 | 8234621364 | Sam's Club USA | 8/4/06 | 120 | 8.25 | 990.00 | 0.50% | | 985.05 | 985.05 | 2.50% | 24.63 | Tank Tops |
| 307058 | 8495622401 | Sam's Club USA | 8/4/06 | 288 | 8.25 | 2,376.00 | 0.50% | | 2,364.12 | 2,364.12 | 2.50% | 56.10 | Tank Tops |
| 307059 | 8232621931 | Sam's Club USA | 8/4/06 | 192 | 8.25 | 1,584.00 | 0.50% | | 1,576.08 | 1,576.08 | 2.50% | 39.40 | Tank Tops |
| 308782 | 6537826882 | Sam's Puerto Rico | 8/8/06 | 168 | 8.25 | 1,386.00 | 0.50% | | 1,378.07 | 1,376.07 | 2.50% | 34.48 | Tank Tops |
| 309102 | 8474626656 | Sam's USA | 8/4/06 | 1,728 | 8.66 | 14,964.48 | 0.50% | 708.48 | 14,161.18 | 14,161.18 | 2.50% | 354.63 | Tank Tops |
| 309101 | 8335626008 | Sam's USA | 9/15/06 | 144 | 8.25 | 1,188.00 | 0.005 | | 1162.06 | 1,162.06 | 2.50% | 29.55 | Tank Tops |
| 309103 | 8493822183 | Sam's USA | 9/15/06 | 72 | 8.25 | 594.00 | 0.005 | | 591.03 | 591.03 | 2.50% | 14.78 | Tank Tops |
| C106048 | 4854633073 | Sam's Canada | 8/9/06 | 336 | 8.25 | 2,772.00 | 0.50% | 3.00% | 2758.14 | 2,758.14 | 2.50% | 86.95 | Tank Tops |
| C108060 | 4854633978 | Sam's Canada | 9/15/06 | 864 | 17.00 | 58,752.00 | 0.50% | 3.00% | 56,855.88 | 50,021.14 | 2.55% | 1,265.53 | Yoga pants |
| 307680 | 6537825610 | Sam's Puerto Rico | 8/21/06 | 1,556 | 12.00 | 19,872.00 | 0.50% | 0.00 | 19,772.64 | 11,535.84 | 2.50% | 288.47 | Yoga pants |
| | | | | | | | | | 19,772.64 | 19,772.64 | 2.50% | 494.32 | Yoga pants |
| | | | | | | | | | | 287,442.86 | | 6,886.07 | |

1

# PURCHASE ORDER

'C, Inc.

1200 Wilson Drive

West Chester PA 19380

(484) 701-1000

Purchase Order Download

**Important**

This Order Number must Appear on all invoices, packing slips, shipping papers and containers

| Order Number | REV NBR |
|---|---|
| 519878 | 00 |

| Date | Pay Terms Initial (A:) Subsequent (B:) | Freight Terms | This order is subject to | F.O.B. |
|---|---|---|---|---|
| 12/18/2006 | A: Net 30 ROG B: NET 120 ROG | PrePaid | general conditions | LANCASTER PA, 17601 - USA |

| Vendor | Ship To | Vendor is responsible to logon to www.qvcproductsearch.com for current guidelines and recent changes. | Do Not Deliver Before 3/12/2007** |
|---|---|---|---|
| US MERCHANTS | QVC,Inc. | | Do Not Deliver After 3/19/2007** |
| 8737 WILSHIRE BLVD | 1000 STONY BATTERY ROAD | | |
| BEVERLY HILLS , CA 90211 | LANCASTER PA17601 | | LC Expiration Date |
| USA | | | |

| Sale or Return | 100% | Payment Reserve | 100% | Reorder | NO | Product Type | NEW |
|---|---|---|---|---|---|---|---|

This order is conditionally issued, pending QVC approval of First-Piece QA sample. Absent such approval, vendor solely responsible for any action taken or not taken by vendor in reliance of this order

| QVC SKU # | Vendor SKU # | Quantity ordered | Description | Unit Cost (US $) | Extended Amount (US $) |
|---|---|---|---|---|---|
| '25 | | | F by Fortuna Valentino Pamplona Linen Satchel | | |
| 2725 012 000 | ML-1292A | 250 | Black, | $36.00 | $9,000.00 |
| 2725 131 000 | ML-1292A | 450 | Natural, | $36.00 | $16,200.00 |
| 2725 204 000 | ML-1292A | 300 | Chestnut, | $36.00 | $10,800.00 |
| als: | | 1000 | | | $36,000.00 |

ECIAL INSTRUCTIONS

help with:

- **Accessing the QVC vendor web site:** vendor_relations@qvc.com, 484-701-8330

- **Routing, Labeling, Bar coding:** supplychain@qvc.com, 484-701-6606

- **Quality Assurance:** qvcqa@qvc.com, 484-701-1373

elp With:

ssing the QVC vendor web site: vendor_relations@qvc.com 484-701-8330.

ng, Labeling, Bar Coding : supplychain@qvc.com 484-701-6606.

ty Assurance : qvcqa@qvc.com 484-701-1373.

>ved by:          ELLEN BOAMAN          Authorized by:          ANNETTE REPASCH

'/www.vendor.studiopark.com/vendor_scripts/purchase_orders/no_images...

= R

**Purchase Order Download**

**Important**

This Order Number must Appear on all Invoices, packing slips, shipping papers and containers

| Order Number | REV NBR |
|---|---|
| 519879 | 00 |

Freight Terms    This order is subject to    F.O.B.

PrePaid    general conditions    LANCASTER PA, 17601 – USA

**Ship To**
QVC,Inc.
1000 STONY BATTERY ROAD
LANCASTER PA17601

Vendor is responsible to logon to www.qvcproductsearch.com for current guidelines and recent changes.

Do Not Deliver Before
3/12/2007**

Do Not Deliver After
3/19/2007**

LC Expiration Date

...VD
..r HILLS , CA 90211
USA

| Sale or Return | 100% | Payment Reserve | 100% | Reorder | NO | Product Type | NEW |
|---|---|---|---|---|---|---|---|

| QVC SKU # | Vendor SKU # | Quantity ordered | Description | Unit Cost (US $) | Extended Amount (US $) |
|---|---|---|---|---|---|
| | | | This order is conditionally issued, pending QVC approval of First-Piece QA sample. Absent such approval, vendor solely responsible for any action taken or not taken by vendor in reliance of this order | | |
| `26 | | | F by Fortuna Valentino Newport Basket Tote | | |
| 112726 012 000 | ML1278 | 850 | Black, | | |
| 112726 172 000 | ML1278 | 850 | Red, | $18.00 | $15,300.00 |
| Totals: | | 1700 | | $18.00 | $15,300.00 |
| | | | | | $30,600.00 |

**SPECIAL INSTRUCTIONS**

or help with:

- **Accessing the QVC vendor web site:**
  vendor_relations@qvc.com, 484-701-8330

- **Routing, Labeling, Bar coding:**
  supplychain@qvc.com, 484-701-6606

- **Quality Assurance:**
  qvcqa@qvc.com, 484-701-1373

r Help With:

cessing the QVC vendor web site: vendor_relations@qvc.com 484-701-8330.
uting, Labeling, Bar Coding : supplychain@qvc.com 484-701-6606.
ality Assurance : qvcqa@qvc.com 484-701-1373.

pproved by:    ELLEN BOAMAN    Authorized by:    ANNETTE REPASCH

)

05/19/2007    09:39    5168835387    QVC    PAGE 03