177106.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X    07-CV-6108
FASHION WORLD, LTD.,

                              **Plaintiff,**

      -against-

JEFF GREEN, ZIARI INTERNATIONAL, LTD.,
US MERCHANTS FINANCIAL GROUP, INC.,
THE MERCHANT OF TENNIS, INC., LISA
NUNZIATA and METAMORPHISIS, INC.,

                              **Defendants.**
-------------------------------------------------------------X

**DECLARATION IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

      Jeff Green, declares under penalty of perjury, as follows:

**Introduction and Background**

      1. I am a defendant in this action, as well as the principal shareholder of defendants Ziari International Ltd. ("Ziari"), U.S. Merchants Financial Group, Inc., and The Merchant of Tennis, Inc. Except as otherwise indicated, I have personal knowledge of the matters set forth herein. I submit this Declaration in opposition to the motion of plaintiff Fashion World Ltd. for a preliminary injunction and expedited discovery.

      2. This action arises from a dispute between plaintiff and Ziari over the computation and payment of royalties under a License Agreement, dated January 26, 2005 (the "License Agreement"). A copy of the License Agreement is annexed as Exhibit A to the plaintiff's Complaint; it is also annexed as Exhibit A to the Declaration of plaintiff's principal, Bruno

1

177106.1

Condi. Under the License Agreement, plaintiff granted Ziari "the exclusive right and license to use" the "F by Fortuna Valentino" trademark in the United States in the manufacture and sale of certain specified "Licensed Products" by Ziari. In exchange for the license, which has an initial term which runs through December 31, 2008 and is subject to additional extensions, Ziari agreed to pay to plaintiff, on a quarterly basis, specified "Royalties" equal to 5% of Ziari's "Net Sales of Licensed Products."

      3. Plaintiff's Complaint pleads no fewer than thirteen separate Causes of Action against Ziari and the other defendants, including claims for breach of the Licensing Agreement, as well as claims under the Lanham Act, the New York General Business Law and New York common law. However, plaintiff's allegations essentially boil to two basic claims: (i) that Ziari failed to pay to plaintiff the agreed upon 5% commission on all of its Net Sales; and (ii) that Ziari sold its Products to customers other than the specified "Authorized Channels of Distribution" (Costco, Sam's and BJ's), such as Marshalls, TJ Maxx and QVC. Based on these alleged wrongs, plaintiff seeks (if its Complaint is to be taken at all seriously) money damages of no less than $4 million, an accounting, as well as an injunction preventing Ziari from selling to any "unauthorized" customers.

      4. For reasons known only to plaintiff and its counsel, plaintiff's Complaint was not preceded by a "cease and desist" letter, or for that matter any other communication describing the alleged breaches of the Licensing Agreement and requesting an explanation for the claimed discrepancy and/or demanding compliance on the part of Ziari with its contractual obligations. Rather, at the same time it filed its Complaint, plaintiff also presented to this Court an Order to Show Cause requesting issuance of an immediate *ex parte* Temporary Restraining Order and bringing on an application for a preliminary injunction on the grounds that plaintiff will suffer

177106.1

immediate irreparable injury unless such relief is granted. In signing the Order to Show Cause but striking the proposed TRO in its entirety, this Court noted that "the plaintiff's failure to give notice of this application [to defendants] is inexplicable." The Court also criticized plaintiff for "wait[ing] until the virtual eve of the Independence Day celebration to make the application." Nevertheless, this Court made the Application returnable on July 6, 2007.

5. As will be explained below, plaintiff's Application should be denied by this Court in its entirety for at least four separate but independently dispositive reasons: (i) there is no danger of "irreparable injury"; (ii) plaintiff has delayed for many months in seeking a preliminary injunction; (iii) this is a dispute about money (the computation and payment of royalties), and plaintiff has a fully adequate remedy at law; and (iv) plaintiff has failed to make the required showing on the underlying merits.

**Plaintiff's Extraordinary Delay in Making this Motion**

6. As the cases cited in the accompanying Memorandum of Law make clear, a preliminary injunction in the Lanham Act context will be denied where there has been a delay by the plaintiff in going to Court to request the relief, since such inaction is wholly inconsistent with a genuine threat of irreparable injury. Here, the undisputed facts – including Mr. Condi's own sworn Declaration, as well as the documents annexed to Mr. Condi's Declaration – confirm that the facts and circumstances which form the predicate for plaintiff's request for preliminary injunctive relief have been known to plaintiff for *over one year*. Under these circumstances, a preliminary injunction should be denied – irrespective of the "merits" of the underlying dispute.[1]

---

[1] The "merits" of plaintiff's claims – and the real reason that plaintiff has been silent and has not objected for many months – is discussed later on in this Declaration.

3

177106.1

7. Thus, the plaintiff's first basis for seeking a preliminary injunction is that Ziari is only paying to plaintiff 2.5% of the Net Sales as Royalties, rather than 5%. But this is by no means a "newly discovered" fact. To the contrary, Mr. Condi freely acknowledges in his Declaration that "during the *first quarter of 2006*, Fashion World received from defendants . . . 2.5% of reported net sales instead of the 5% royalty under the terms of the Agreement." (Condi Decl. ¶16; emphasis supplied.) Moreover, Mr. Condi annexes to his Declaration some of the statements delivered by Ziari to plaintiff which explicitly state that the royalties were being computed and paid at the rate of 2.5%. For example, Exhibit B to the Condi Declaration is the statement for the period January – May 2006, which clearly reflects commissions computed at the rate of 2.50%. Exhibit C to the Condi Declaration, the statement for the third quarter of 2006, indicates that *all commissions* were paid at the rate of 2.5%.

8. The upshot is that plaintiff cannot possibly dispute that it knew *in early 2006* that it was receiving commissions at the rate of 2.5%, and did nothing about it. Such lethargy and inaction makes any current claim of "irreparable injury" empty rhetoric. This is particularly the case since plaintiff has cashed all of our royalty checks during this period *based on the 2.5% commission calculation.*

9. Nor is there any serious dispute that plaintiff has known about the so-called "unauthorized sales" to Marshalls, TJ Maxx and QVC for many months. The documents annexed as Exhibit I to the Condi Declaration indicate that the orders to these customers were obtained in *October and December 2006*. Moreover, as explained in the accompanying Declaration of Justin (Skip) Rosenblatt, Mr. Condi was specifically advised in *September 2006* that we were going to sell our handbags to these customers. Plaintiff's decision to wait more than *six months* to file this

4

177106.1

Complaint and seek a preliminary injunction is completely inconsistent with a genuine threat of irreparable injury unless such sales are enjoined.

**At Most, This is a Dispute About Money**

10. Even putting aside plaintiff's extraordinary delay, this is fundamentally a dispute about *money*; to wit, the proper computation and payment of royalties. *See, e.g.,* Condi Decl. ¶16 (plaintiff is owed commissions for Net Sales in the first quarter of 2006; *id.* ¶17 (plaintiff is owed commissions for Net Sales for the third quarter of 2006); *id.* ¶18 (plaintiff is owed approximately $1,800 for Net Sales in the fourth quarter of 2006; *id.* ¶19 (plaintiff is owed commissions for Net Sales in the first quarter of 2007). There is obviously no need for a preliminary injunction under such circumstances, since (if plaintiff is correct about the computation of Royalties) its damages can be computed to the *penny*. [2]

**The Contractual Remedies in the Licensing Agreement Render Injunctive Relief Inappropriate**

11. The total inappropriateness of a preliminary injunction with respect to this dispute is, I believe, further confirmed by two separate provisions of the Licensing Agreement. First, Section 5.1 of the Licensing Agreement permits plaintiff "full access to all records and documents relating to the computation of Royalties" for the purpose of performing an accounting to determine whether any additional monies are owed. If, after such a review, it is determined that such monies are indeed owed by Ziari, the Licensing Agreement grants plaintiff a full and complete remedy – the Agreement provides that plaintiff shall receive full payment, together

---

[2] In his Declaration, Mr. Condi acknowledges that his "real gripe" concerning the sales to TJ Maxx and Marshalls is not that these customers were "unauthorized", but that he allegedly did not receive his full Royalties payment. *See* Condi Decl. ¶24.

5

177106.1

with interest at a rate equal to 2% above Prime. At no time has plaintiff ever availed itself of its contractual right to obtain an accounting or review the books and records of Ziari.

12. Second, Section 12.2 of the Agreement provides that in the event of a claimed "material breach" on the part of Ziari, plaintiff may not terminate the Agreement unless Ziari is given prior notice and an opportunity to cure the alleged default. The clear purpose and intent of this notice provision is to afford Ziari an opportunity to address (and hopefully resolve) any concerns on the part of plaintiff *before* a lawsuit. Needless to say, that objective was completely subverted here by plaintiff's rush to the courthouse.

**Plaintiff Authorization of and Consent to the
So-Called "Breaches" of the Licensing Agreement**

13. As noted above, plaintiff has known about the computation of royalties and our sales to Marshalls, TJ Maxx and QVC for many, many months. The reason plaintiff has never objected is quite simple and has nothing to do with its current claims of "fraudulent concealment" on our part. It is, rather, that while the Licensing Agreement originally provided for an "across the board" 5% commission structure and restricted our sales to the three "authorized customers", Mr. Condi agreed that those provisions would be altered on a going forward basis.

14. Thus, in a meeting held on March 24, 2006 in my Los Angeles offices, attended by Mr. Rosenblatt, Mr. Condi and me, plaintiff and I agreed that the commissions would be reduced from 5% to 2.5% in order to permit Ziari to have funds available to invest in the marketing and improvement of the product line (and, hopefully), increase sales (and overall Royalties) in the future. Based on this understanding, all Royalties paid by Ziari to plaintiff in the second quarter of 2006 (and thereafter) were computed at the new 2.5% commission rate. If, as

177106.1

plaintiff now contends, the 5% commission remained unchanged (and Ziari was in flagrant breach of its obligations), plaintiff would certainly have objected by at the very least sending a note, email or memo demanding the full commission. That it did *absolutely nothing* for almost 15 months is, I believe, overwhelmingly persuasive evidence that the commission structure was indeed altered.

15. In his Declaration, Mr. Rosenblatt also confirms that at a meeting held in New York City on September 28, 2006, he and Mr. Condi agreed that Ziari would be authorized and permitted to sell handbags to customers other than the three "authorized customers" listed in the Licensing Agreement. To state the obvious, Mr. Condi would have no reason to object to such sales, which would only put more money in his pocket in the form of Royalties. Once again, any denial of the existence of this modification makes no sense – why would Ziari go to the expense and effort of manufacturing thousands of pieces of merchandise *without* the prior knowledge or approval of plaintiff? And why would he sit idly by for more than six months while these allegedly "unauthorized sales" were going forward?

16. In short, we are confident that at trial we will be able to demonstrate to the satisfaction of the trier of fact plaintiff's knowledge and authorization of both our sales of the handbags to these customers, as well as the reduction in Royalties. For purposes of this Motion, it is respectfully submitted that the utter implausibility of plaintiff's position necessarily means that plaintiff has failed to make the required showing of a likelihood of success on the merits of its claim that we have breached our obligations under the Licensing Agreement.

**Plaintiff's Bogus Claims of "Fraudulent Concealment" of Sales**

17. Plaintiff also suggests that we have somehow "fraudulently concealed" our sales to Marshalls, QVC and TJ Maxx. It is hard to take this claim seriously, since the very documents

7

177106.1

reflecting these sales (annexed to Mr. Condi's Declaration as Exhibit I) *were produced by Ziari and delivered to plaintiff in the ordinary course of business.* It is a most uncommon specie of fraud where the alleged wrongdoer voluntarily produces to the "victim" the very information which is allegedly being "concealed."

18. In any event, as the documents indicate, these handbags were only shipped to our customers in March and April 2007; and any payments would have been received by Ziari from these customers in the second quarter of 2007 at the earliest. Thus, the "Net Sales" would only be reflected on the accounting for the *second quarter* of 2007, which has not yet been prepared or delivered to plaintiff. (Section 4.1 of the License Agreement provides that Royalties are paid quarterly; the second quarter royalties are due on July 15, 2007. Moreover, such Royalties are only computed on "Net Sales", which is defined as "the aggregate amount *received by* Licensee during the period for which Royalties are being computed . . ." (License Agreement, §1.1; emphasis supplied.)) In short, plaintiff's entire "concealment" theory is based on the failure to disclose information and pay monies for which there is no existing obligation to disclose and no existing obligation to pay.

**The eBay Allegations**

19. Perhaps the most frivolous portion of plaintiff's Motion is the contention based on sales of plaintiff's merchandise on eBay. According to plaintiff, these sales constitute an "unauthorized sub-license to eBay." (Condi Decl. ¶22) But if the Court looks at the actual documents annexed to Mr. Condi's Declaration as Exhibit H, the Court will see that these are not sales *by Ziari,* but are postings by *individuals* ("desertgrace645", "ez3071", and "trains1945") with no connection with Ziari. Apparently, these are persons seeking to sell particular individual

177106.1

items of merchandise which *they* purchased in stores or otherwise. How this can give rise to a claim against Ziari is beyond me.[3]

**Plaintiff's Wrongful Interference With Our Business and Contractual Relations**

20. While not directly relevant to this Motion, we note that Mr. Condi, perhaps inadvertently, reveals that plaintiff has wrongfully attempted to interfere with Ziari's business relationships behind our back. One of our representatives is Lisa Nunziata and her company, Metamorphosis, Inc. In his Declaration, Mr. Condi states that plaintiff "offered Nunziata an opportunity to demonstrate her marketing ability", by permitting Nunziata to sell products, including the handbags, to customers. (Condi Decl. ¶¶ 26-28) The problem is that under the Licensing Agreement, plaintiff granted *Ziari* "the *exclusive right* and license to use the Trademarks in the Territory. . ." Even apart from this contractual exclusivity, it is outrageous for plaintiff to interfere with our relationship with our agent. At the appropriate time, we intend to assert a counterclaim against plaintiff for this wrongful act.

**A Substantial Undertaking Must be Posted if a Preliminary Injunction is Granted**

21. As set forth above, plaintiff's request for a preliminary injunction should be denied in its entirety. However, in the event this Court nevertheless believes such relief appropriate, plaintiff should be required to post an undertaking in at least the amount of $3 million. We have expended substantial sums and effort in developing the handbag product which we are currently selling to Marshalls and the other retailers, with the consent and authorization of plaintiff, and expect to achieve substantial sales and profits. If a preliminary injunction is issued

---

[3] Mr. Condi also states that he purchased a piece of clothing for $35.81 from Sam's Club in Elmsford, New York, which sale "was not reported" by Ziari on its third quarter sales report. Condi Decl. ¶20. It is far from clear that this sale was *not* reported, as Mr. Condi states. In any event, a preliminary injunction cannot possibly be issued based on a single sale of $35.81, which would generate a commission of approximately *$1.80*.

177106.1

preventing us from continuing this business, and it is ultimately determined that plaintiff had no right to block the sales, we will have suffered substantial injury to our business.

**There is No Basis for Expedited Discovery**

22. Nor is there any basis for granting plaintiff's request for expedited discovery. According to plaintiff, immediate discovery is required because "if plaintiff cannot get speedy access to defendants' records, defendants will be able to dispose of documents that provide evidentiary proof as to their fraudulent account methods." Plaintiff's Memorandum at 5. This is absolute (and, frankly, offensive) nonsense. Rather than conceal the computation of Royalty payments, we have specifically disclosed to plaintiff our sales and the method of computing Royalties. Indeed, the very documents upon which plaintiff bases its claims (such as the invoices from TJ Maxx and Marshalls) were produced by us to plaintiff. Given all this, I am shocked that plaintiff and its counsel can accuse us of threatening to "alter, destroy or otherwise manipulate [our] files."

**Conclusion**

23. The bottom line is that at the very most, this is a dispute under the Licensing Agreement as to how much plaintiff should be paid by defendant in Royalties. Contrary to the overheated rhetoric in the Complaint and the Condi Declaration, there is no "fraudulent concealment" or anything of the kind. Plaintiff has at all relevant times known about the Royalty payments and the sales to the other customers (because we gave them this information) and has consented to and approved of such payments and sales. Even if there is a genuine dispute about plaintiff's approval, there is no basis for the extraordinary remedy of a preliminary injunction or expedited discovery. If the dispute cannot be worked out between the parties in negotiations (or through the contractual mechanisms of an accounting), it should be resolved in an ordinary

177106.1

lawsuit; there is no need to burden the parties and this Court with the expense and inconvenience of an expedited proceeding or provisional relief.

**WHEREFORE,** for the foregoing reasons, as well as for the reasons set forth in the Memorandum of Law, defendants respectfully request that this Court deny plaintiff's Application for a Preliminary Injunction and expedited discovery in all respects.

_____
Jeff Green